**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

BRYON MEEKS, et al.,

                          Plaintiff,

v.                                 CIVIL ACTION NO.   2:20-cv-00583

BOBBY MCCLUNG, et al.,

                          Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are the parties' cross-motions for summary judgment.  (ECF Nos. 92, 94.)   For the reasons more fully explained below, Plaintiffs' joint motion for summary judgment is **DENIED**, (ECF No. 92), and Defendants' joint motion for summary judgment is **GRANTED**, (ECF No. 94).

*I.    BACKGROUND*

a.

Plaintiff Byron Meeks ("Plaintiff Meeks") was, at all times relevant to this suit, a self-employed automotive mechanic who resided in Parkersburg, West Virginia ("the City" or "Parkersburg").   (*See, e.g.*, ECF No. 97-4.)   Plaintiff Meeks operated a small vehicle repair shop, eponymously named "Byron's Garage," out of his residence located at 1507 Lynn Street in Parkersburg. [1]   (*Id.* at 1.)   Opening Byron's Garage took a little work.   Per City zoning

---

[1]  The record suggests that Plaintiff Meeks' garage is actually named "Meeks Auto Body and Repair." (ECF No. 94-3

ordinances, Plaintiff Meeks' home was in a residential area, so Plaintiff Meeks could not run an auto-repair shop out of his garage.   (ECF No. 94-2 at 1; ECF No. 94-5.)   Undeterred by a little red tape, Plaintiff Meeks petitioned City zoning officials for a variance.   (*See* ECF No. 94-5.) The zoning officials initially expressed some concern over where Plaintiff Meeks would park customers' cars but ultimately granted the variance in mid-2012.   (*Id.*; ECF No. 94-4 at 1–2.)

In 2018 or so, Plaintiff Meeks decided to expand parking for Byron's Garage.   He did so by using two nearby lots on 15th Street.   (ECF No. 94-2 at 2.)   The first, Lot 816, was owned by Plaintiff Meeks.[2]   (ECF No. 94-4 at 2.)   Lot 816 sat opposite a paved, public road from Plaintiff Meeks' Lynn Street home with about 80 or 90 feet separating the two.   (ECF No. 93 at 4 n.4.) The Lot measured approximately 20 feet wide and 50 feet deep, so a handful of cars could easily fit on it.   (*Id.*)   Although Lot 816 abutted the public road, it was largely inaccessible by the public: Plaintiff Meeks ran a locked, chain link gate across the entrance, leaving only a four-foot-wide entrance on one end.[3]   (*Id.*)   Notwithstanding a single sheet of plywood covering one half of the gate, the Lot was easily visible to the public.   Surveillance camera footage from Plaintiff Meeks' home depicts several cars parked on Lot 816, all of which were in plain view and easily observable by passersby.   (*Id.*)

The second lot, Lot 815, was owned by Gary Traugh.   (ECF No. 94-6 at 3.)   He and Plaintiff Meeks never entered a formal lease agreement, but Plaintiff Meeks still used the Lot with his permission.   (*Id.*; ECF No. 94-4 at 2.)   It is unclear how far the Lot was from Plaintiff Meeks'

---

at 1.)   Plaintiff Meeks, however, included Byron's Garage as a plaintiff instead of Meeks Auto Body and Repair, so the Court will assume for present purposes that the garage is in fact named Byron's Garage.

[2]  Plaintiff Meeks acquired Lot 816 in 2015 and received a variance for it, too.   (ECF No. 94-7 at 3.)

[3]  Plaintiff Meeks claims that Lot 816 was completely enclosed and thus inaccessible to Defendants, (ECF No. 93 at 3.) but the evidence he supplied the Court clearly indicates otherwise.   *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

2

home.   In any event, Lot 815 was apparently not fenced off from the public and sufficed to store several cars.   (ECF No. 94-6 at 4–5.)   Plaintiff Meeks used the two Lots for a few years without major incident.[4]

That changed in 2020.   Plaintiff Meeks, who was in the midst of an unsuccessful write-in campaign to unseat Defendant Tom Joyce ("Defendant Joyce") as Parkersburg's mayor, (ECF No. 93 at 3 n.3.) had allowed Lots 815 and 816 to become somewhat disheveled.   (ECF No. 94-4.) This led to his neighbor, Deidra Prince, complaining to City officials that summer.   (*Id.* at 3–4.) She claimed that the scene was unsightly, that several cars had sat idle long enough for weeds to grow up around them, and that rats had taken refuge in Lot 816.   (*Id.*)   She also complained that several cars were illegally parked on the Lots.   (*Id.*)

City Code Enforcement officials responded on August 6, 2020.   Those City officials, Defendants Bobby McClung, Darren Winans, and Mike Winters, went to the Lots to investigate, despite having no search warrant.   (ECF No. 94-6 at 2.)   They began at Lot 816.   (*Id.* at 3.)   The trio first saw several cars parked both in the Lot and on the street.   (*Id.*)   From there, they entered Lot 816, slipping through the small entryway left by the gate, and continued their investigation inside the gated area, where they ticketed several cars for City code violations.   (*Id.* at 3–4.) They also took photographs and collected vehicle information, such as VIN numbers, registration information, and inspection sticker details.   (*Id.* at 4.)   Defendants McClung, Winans, and Winters later crossed the street and went to Lot 815.   (*Id.*)   However, before entering that Lot, Defendant McClung called Traugh and asked for his permission to enter and search the Lot.   (*Id.*) Traugh gave them his blessing.   (*Id.*)   So the group searched Lot 815 too, again ticketing cars and

---

[4]  City zoning officials notified Plaintiff Meeks in November 2018 that he was illegally parking cars, but no action was taken by Plaintiff Meeks or any City official.   (ECF No. 94-4 at 3.)

collecting identifying information from them.   (*Id.* at 5.)   Once complete, Defendants McClung, Winans, and Winters left.   (*See id.*)

These searches were problematic for Plaintiff Meeks.   Someone with the City Code Enforcement soon ran the VIN numbers through a database to determine ownership.   (ECF No. No. 94-7 at 3.)   One car, a 2003 Honda Element, turned out to be stolen out of Rhode Island.   (*Id.* at 3–4.)   Parkersburg's Chief of Police, Defendant Joe Martin ("Joe Martin"), was informed of this and he relayed this information to one of his subordinates, Defendant Matthew Eichhorn ("Defendant Eichhorn").   (*See id.* at 3.)   Defendant Eichhorn went to Plaintiff Meeks' home to investigate on August 10, 2020, also without a warrant.   (*Id.* at 4.)   Defendant Eichhorn arrived, saw the Honda, and struck up a conversation with Plaintiff Meeks.   (*Id.*)   After hearing the reason for rendezvous, Plaintiff Meeks assured Defendant Eichhorn that he in fact owned the Honda.   (*Id.*)   Plaintiff Meeks retrieved what he claimed to be the car's title and gave it to Defendant Eichhorn.   (*Id.*)   Defendant Eichhorn took the proffered title, returned to his cruiser, and tried verifying its authenticity.   (*Id.*)   In doing so, he called the National Crime Information Center Database ("NCIC") and spoke with a detective there.   (*Id.*)   But rather than confirming the title's authenticity, the NCIC detective confirmed what Defendant Eichhorn had suspected—the Honda was stolen.   (*Id.*)   Defendant Eichhorn arrested Plaintiff Meeks for receiving stolen a stolen vehicle.[5]   (*Id.*)

Things went quiet for a few months.   But by the spring of 2021, Plaintiff Meeks had yet to clean up Lots 815 and 816.   (ECF No 94-4 at 3.)   So the City initiated a civil action in the Circuit Court of Wood County, hoping to get the Lots declared a public nuisance.   (ECF No. 94-2.) Judge Beane, the presiding Circuit Judge, heard evidence from both the City and Plaintiff Meeks

---

[5] The record is silent as to the disposition of this arrest.

4

but ultimately ruled in the City's favor.   (ECF No. 94-4.)   In his May 3, 2021, Order ("the Circuit Court Order" or "the Order"), Judge Beane concluded that Plaintiff Meeks had created a public nuisance on Lots 815 and 816.   (*Id.* at 5.)   To abate the nuisance, Judge Beane ordered Plaintiff Meeks to remove all vehicles stored on the Lots within 30 days.   (*Id.* at 6.)   Once Plaintiff Meeks did so, he would be allowed to store up to five customers' cars on Lot 816, but none on 815.   (*Id.*) However, if Plaintiff Meeks did not first remove every car off the two Lots, the City would have the right to do so.   (*Id.* at 7.)

Thirty days came and went without Plaintiff Meeks taking any action.   (*See* ECF No. 93 at 4 n.4)   After his 30-day grace period passed, the City began the abatement process itself.   (*Id.*) On June 9, several City officials, including Defendants Joyce, Martin, McClung, and Jason Matthews, went to Lot 816.   (*Id.*)   Once there, Defendant Martin cut the lock off Lot 816's gate. (*Id.*)   These four Defendants then watched as other City officials swung open the gate and helped a tow truck back into the Lot.   (*Id.*)   The tow truck then towed away every car on the Lot—four in all—and impounded them at a privately owned facility.   (*See id.*)

The next eight months were uneventful.   But on February 18, 2022, John Doe officers again returned to the Lots, again towed more vehicles away, and again impounded them on a privately owned lot.   (*See* ECF No. 94-11 at 3.)

Two John Doe officers returned less than a week later on February 24, 2022.   This time, they went to Plaintiff Meeks' Lynn Street home, and as best the Court can tell, arrested him without a warrant.   (ECF No. 93 at 5 n.7.)   The record evidence for this arrest is scant.   Plaintiff Meeks produced only surveillance video footage from his porch, which shows the John Doe officers walking a handcuffed Plaintiff Meeks off his porch and placing him in a waiting police

cruiser.   (*Id.*)   The record is silent as to the offense of arrest, what led to it, or what became of it. Importantly, though, Plaintiff Meeks does not claim the two John Does ever entered his home when making this warrantless arrest.

Plaintiff was arrested again on March 5, 2022.   (ECF No. 94-10.)   That time, Patrolman M.E. Stewart of the Parkersburg Police pulled Plaintiff Meeks over for a defective headlight and an expired inspection sticker.   (*Id.* at 1–2.)   Patrolman Stewart asked Plaintiff Meeks for his license, insurance, and registration, but he had none of the above.   (*Id.* at 2.)   As it turned out, Plaintiff Meeks' driver's license had been suspended after he failed to pay the citations issued for illegally parking cars on Lots 815 and 816.   (*Id.*; see also ECF No. 94-4 at 3.)   Patrolman Stewart arrested Plaintiff Meeks for driving on a suspended license, having an expired registration, no insurance, and an expired inspection sticker.   (ECF No. 94-10 at 2.)   Plaintiff Meeks later pled guilty to having no insurance and driving on a suspended license, and he was fined $1,040.50. (ECF No. 97-13 at 2.)   The other two charges were dismissed.   (*Id.*)

Plaintiff Meeks was arrested for a fourth and final time in the summer of 2022.   (ECF No. 94-11 at 2.)   Of the cars towed away that February, one was a 2017 Chrysler Pacifica owned by Tiffany Haugh.   Her Pacifica had been wrecked in January 2022, and she took it Byron's Garage for repairs.   (*Id.* at 1–2.)   Plaintiff Meeks instructed Haugh to cash her insurance check—worth $5,911.95—so he could order parts and begin work.   (*Id.* at 2.)   Haugh obliged, cashed the check, left the cash and Pacifica with Plaintiff Meeks, and went about her business.   (*Id.*)   Haugh and Plaintiff Meeks kept in touch over the next few months, as he purported to update her on the Pacifica's progress.   (*Id.*)   But instead of telling Haugh that her car was impounded and unable to be worked on, Plaintiff Meeks told her that the Pacifica was at a frame straightening shop being

fixed.  (*Id.*)  Haugh didn't know any better until Pifer's, the towing company, sent her a letter informing her that Pifer's—not Plaintiff Meeks—had possession of her car.  (*Id.*)  When she went to Pifer's to verify this, she learned that her Pacifica was not only not being worked on but was also missing the catalytic converter.  (*Id.*)  Haugh went to the Parkersburg Police and complained about this ordeal sometime in July 2022.  (*Id.*)  After hearing her story, Sergeant C.A. Miller, a member of the Parkersburg Police, arrested Plaintiff Meeks without a warrant[6] for receiving money by false pretenses.  (*Id.*)  This charge was later dropped in exchange for Plaintiff Meeks paying restitution.   (*Id.* at 1.)

b.

This case has a peculiar procedural history.   Following his August 2020 arrest, Plaintiff Meeks filed a *pro se* complaint in this Court on September 8, 2020, invoking this Court's original jurisdiction pursuant to 18 U.S.C. § 1331.   (ECF No. 1.)   He initially sued just four defendants—Bobby McClung, Matthew Eichhorn, Darren Winan, and Mike Winters—each in their individual and official capacities.  (*Id.* at 2–3.)   Plaintiff Meeks alleged violations of his First, Fourth, and Fourteenth Amendment rights and sought "1 zillion dollars" in damages.  (*Id.* at 4–7.)

Plaintiff Meeks then litigated this case *pro se* for some time.   Dispositive motions pared down most of his claims, but the Court ultimately found, on the record before it, that Plaintiff Meeks had a triable Fourth Amendment claim.   (ECF Nos. 43, 45.)   Following that ruling, but

---

[6] The record is actually ambiguous on whether Sergeant Miller had an arrest warrant.   Defendants provided the Court with a criminal complaint, which was filled out by Sergeant Miller and submitted to a Wood County magistrate. (ECF No. 94-11 at 2–3.)   That criminal complaint shows that the magistrate found probable cause, checked the box beside "Warrant issued," and signed the criminal complaint.   (*Id.* at 2.)   But Defendants have not produced the arrest warrant itself.   Because criminal complaints and arrest warrants are different documents serving different purposes under West Virginia law, *see* W. Va. Magistrate Ct. R. 3, 4, the Court will construe the ambiguity in the light most favorable to Plaintiff Meeks and infer that Sergeant Miller arrested him without a warrant.

7

before a trial date had been set, Plaintiff Meeks retained counsel.   (ECF Nos. 44, 46.)   His counsel immediately moved to amend his *pro se* complaint, (ECF No. 48) and the Court granted that motion on January 26, 2023, (ECF No. 52).   Plaintiff Meeks filed his eight-count Amended Complaint on February 6, 2023.   (ECF No. 54.)

The Amended Complaint reframed the case considerably.   Not only did it include new allegations stemming from the events of 2021 and 2022 but it also brought in new parties.   (ECF No. 54 at 3–7.)   Bryon's Garage was added was a plaintiff, and Tom Joyce, Joe Martin, Mike Winters, and John Does 1–10 were joined as defendants, each being sued in their individual and official capacities.   (*Id.* at 3–4.)   The Amended Complaint also required reopening discovery. The original claims, which alleged violations of the First, Fourth, and Fourteenth Amendments, were amended to account for the post-2020 events.   (*Id.* at 7–13.)   There were also several new claims.   The Amended Complaint brought a municipality liability claim, colloquially known as a "*Monell* claim,"[7] as well as a federal claim for civil conspiracy to violate constitutional rights. (*Id.* at 13–14, 16–17.)   The Amended Complaint also tacked on several state-law claims.   These included abuse of process, battery, and tortious interference with a business relationship, which the Court has supplemental jurisdiction to hear under 28 U.S.C. § 1367.   (*Id.* at 14–17.)

The new discovery deadline has since come and gone, and each party has filed a motion for summary judgment (except John Does 1–10, of course).   Plaintiff Meeks and Byron's Garage (collectively "Plaintiffs") filed their joint motion for summary judgment on September 11, 2023. (ECF No. 92.)   Defendants Joyce, Martin, Matthews, McClung, Eichhorn, Winans, and Winters (collectively "Defendants") filed their joint motion that same day.   (ECF No. 94.)   The two camps then filed their respective joint responses on September 25, (ECF Nos. 97, 98), and their

---

[7] *See generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

joint replies on October 2, (ECF Nos. 99, 100.).   As such, the cross-motions for summary judgment are now ripe for adjudication.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. In pertinent part, this rule states that a court should grant summary judgment if "there is no genuine issue as to any material fact."   Summary judgment should not be granted, however, if there are factual issues that reasonably may be resolved in favor of either party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."   *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   When evaluating these factual issues, the Court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

"The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence' . . . ."   *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).   "This burden may be met by use of the depositions and other discovery materials."   *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984).   Once the moving party meets its burden, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   Should a party fail to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial."   *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."   *Liberty Lobby*, 477 U.S. at 256.   "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff."   *Id.* at 252.

## III.   DISCUSSION

### A.  Fourth Amendment

The Fourth Amendment, applicable to the States by way of the Fourteenth Amendment, *Ker v. California*, 374 U.S. 23, 30 (1963), guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   Plaintiffs here complain of three different allegedly unreasonable searches and seizures: (1) Defendants' warrantless intrusion upon and inspection of Lots 815 and 816; (2) Defendants' towing away of the vehicles stored on those Lots; and (3) Defendants' warrantless arrests of Plaintiff Meeks.   (ECF No. 54 at 8–10, ¶ ¶ 39–43.)   The Court addresses each in turn.

### 1.  Lots 815 and 816

Plaintiffs first contend that Defendants violated their Fourth Amendment rights by conducting warrantless searches of customers' cars stored on Lots 815 and 816.   (ECF No. 93 at 12–14.)   Specifically, Plaintiffs aver that these Lots were private property, in which they had a reasonable expectation of privacy, and Defendants trespassed upon the lots to record license plate numbers, VIN numbers, and inspection sticker details.   (ECF No. 98 at 5–8.)   This, they claim, violated their Fourth Amendment rights against unreasonable searches.   (*Id.*)   Not so.

The Fourth Amendment does not guard against *all* searches, only *unreasonable* ones. U.S. Const. amend. IV.   A search is unreasonable when "the government violates a person's 'reasonable expectation of privacy.'"   *United States v. Taylor*, 54 F.4th 795, 803 (4th Cir. 2022) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).   Warrantless intrusions into people's personal affairs generally do so.   *United States v. Davis*, 690 F.3d 226, 241 (4th Cir. 2012) ("[W]arrantless searches 'are *per se* unreasonable under the Fourth Amendment.'").   But there are exceptions.   *See, e.g.*, *Fernandez v. California*, 571 U.S. 292, 298 (2014) ("[C]ertain categories of permissible warrantless searches have long been recognized."). Two such exceptions are consent to search and the open-fields doctrine.   *United States v. Dunn*, 480 U.S. 294 (1987) (open-fields); *United States v. Hatfield*, 365 F.3d 332, 339 (4th Cir. 2004) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49 (1973)) (consent).

a.

Starting with Lot 815, Defendants did not violate the Fourth Amendment because they had the owner's consent to enter and search.   Specifically, Gary Traugh—not Plaintiffs—owned Lot 815, and he gave Defendant McClung permission to enter Lot 815.   Traugh's consent thus relieved Defendants of any obligation to first obtain a warrant.   *Fernandez* 571 U.S. at 298 ("It would be unreasonable—indeed, absurd—to require police officers to obtain a warrant when the sole owner or occupant of [property] voluntarily consents to a search.").

Turning now to Lot 816, the Court finds it irrelevant whether Defendants trespassed because the open-fields doctrine permits warrantless searches of private property beyond the curtilage.   Nearly a century ago, in *Hester v. United States*, the Supreme Court first adopted the open-fields doctrine when it declared that "the special protection accorded by the Fourth

Amendment to the people in their 'persons, houses, papers and effects,' [does] not extend[] to the open fields.   The distinction between the latter and the house is as old as the common law."   265 U.S. 57, 59 (1924).

The Court later refined the open-fields doctrine in *Oliver v. United States*, 466 U.S. 170 (1984).   There, the Court held that the Fourth Amendment protects both the home and curtilage, that is, the "land immediately surrounding and associated with the home," "from warrantless intrusion by government officers."   *Id.* at 180–81.   However, the Court further held that individuals have no reasonable expectation of privacy in "activities conducted out of doors in fields, except in the area immediately surrounding the home."   *Id.* at 178.   In doing so, the Court drew a hard line at the curtilage's edge, reaffirmed *Hester*, and again held that the Fourth Amendment provides no protection against warrantless searches on private property beyond the curtilage, *i.e.*, open fields.   *Id.*

Then, in *Dunn*, the Court announced the following four-factor test to differentiate curtilage from open fields:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

480 U.S. at 301.   Importantly, the *Dunn* Court cautioned that this test is not "a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions."   *Id.*   "[T]hese factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."   *Id.*

That said, the Court here has little difficulty concluding that, under *Dunn*, Lot 816 lay beyond the curtilage of Plaintiff Meeks' home, and he thus has no reasonable expectation of privacy in the Lot.   First, Lot 816 and Plaintiff Meeks' house lie some distance apart, perhaps 80 feet or so, which "supports no inference that [Lot 816] should be treated as an adjunct of the house."   *Dunn*, 480 U.S. at 302; *see also United States v. Jackson*, 728 F.3d 367, 374 (4th Cir. 2013) (drawing the curtilage's edge 20 feet from the back door of an apartment).   Second, not only is Lot 816 not "included within an enclosure surrounding the home," *Dunn*, 480 U.S. at 301, Lot 816 is separated from the home by a paved, public road, and is itself enclosed by fence that further divides it from Plaintiff Meeks' home, *id.*, 480 U.S at 302 (finding that a barn and home, each enclosed within their own fence, "stand[] out as . . . distinct portion[s] of" the property and are "quite separate from" one another).   Third, Plaintiffs use Lot 816 for purely commercial purposes—storing customers' cars—which is hardly an "intimate activity associated with the . . . privacies of life."   *Dunn*, 480 U.S. at 300 (internal quotation marks omitted) (quoting *Oliver*, 466 U.S. at 180).   Fourth and finally, Plaintiffs have taken few steps to protect Lot 816 from public observation.   True, Plaintiffs did erect a chain-link fence in front of the Lot and cover part of it with a sheet of plywood.   But that fence only protected the Lot from unwanted physical invasion; it did little to prevent curious, and even nosy, onlookers from observing the Lot and its contents.   *Oliver*, 466 U.S. at 180 ("It is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields.").

With all four *Dunn* factors cutting sharply against Lot 816 being curtilage, the Court finds that Lot 816 is an open field under the Fourth Amendment.   Plaintiffs thus had no reasonable

expectation of privacy in the Lot, and Defendants' warrantless intrusions did not violate the Fourth Amendment.

Plaintiffs resist this conclusion.   They contend that summary judgment is inappropriate because the Court has already found a genuine issue of material fact "as to the openness of [Lot 816 to] the public and whether Plaintiff [Meeks] had a reasonable expectation of privacy" in Lot 816.   (ECF No. 98 at 6–7.)   While true, this Court has since allowed Plaintiff Meeks to amend his complaint, add new parties, start discovery anew, and rebrief these issues.   Now, upon rebriefing and after consideration of new evidence, the Court easily applies well-settled precedent to reach the clear-cut conclusion that Lot 816 is an open field unworthy of Fourth Amendment protection. Plaintiffs' contrary position is thus meritless.[8]

b.

Having determined that Defendants' physical intrusion onto Lots 815 and 816 did not violate the Fourth Amendment, the Court must now determine whether Defendants committed an unreasonable search by collecting license plate numbers, VIN numbers, and inspection sticker details off the vehicles stored there.   They did not.

*New York v. Class*, 475 U.S. 106 (1986), compels this conclusion.   In *Class*, the Supreme Court held that motorists have no reasonable expectation of privacy in their vehicle's VIN number. *Id.* at 113–14.   This is so, the Court held, because VIN numbers are "required by law to be located in a place ordinarily in plain view from the [vehicle's] exterior," and nobody has a reasonable expectation of privacy in matters "thrust into the public eye."   *Id.*   So, if motorists lack a reasonable expectation of privacy in their VIN number, which is in small print on a car's

---

[8] The Court is also puzzled as to why Plaintiffs believe summary judgment cannot be granted based on this prior ruling when Plaintiffs themselves filed their own joint motion for summary judgment, themselves urging the Court to find that there are no genuine issues of material fact.

dashboard, motorists must also lack a reasonable expectation of privacy in their license plate numbers and inspection sticker details, both of which are emblazoned on the vehicle's exterior and easily visible by the public. *See, e.g.*, *Texas v. Brown*, 460 U.S. 730, 740 (1983) (plurality opinion) ("There is no legitimate expectation of privacy shielding that portion of . . . an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." (internal citations omitted)); *United States v. George*, 971 F.2d 1113, 1119 (4th Cir. 1992) ("The Supreme Court has repeatedly refused to recognize a legitimate Fourth Amendment privacy interest in those parts of an automobile[] . . . that are visible from [the] outside.").

### 2. Towing of Vehicles

Plaintiffs next claim that Defendants violated the Fourth Amendment by towing vehicles off of Lot 816.   In support, Plaintiffs make two alternative arguments.   First, they argue that these warrantless seizures were *per se* unreasonable, as Defendants had no warrant, nor did any warrant exception apply.   (ECF No. 93 at 13–14.)   Second, and alternatively, Plaintiffs say that even if the Circuit Court Order allowed Defendant to tow *some* cars, they nevertheless exceeded its scope by towing *every* car.   (*Id.* at 14.)   Neither argument withstands scrutiny.

The Fourth Amendment prohibits government actors from committing unreasonable seizures.   U.S. Const. amend. IV.   Although this right is typically invoked in criminal proceedings, the Supreme Court has made clear that "the [Fourth] Amendment[] . . . applies in the civil context as well."   *Soldal v. Cook County*, 506 U.S. 56, 67 (1992).   "A 'seizure' of property occurs," for Fourth Amendment purposes, "when there is some meaningful interference with an individual's possessory interests in that property."   *United States v. Jacobsen*, 466 U.S. 109, 113

(1984).   Nobody here disputes that Defendants seized the cars by towing and impounding them; the parties dispute only whether those seizures were reasonable.

"The touchstone of the Fourth Amendment is reasonableness." *United States v. Knights*, 534 U.S. 112, 118 (2001).   To that end, courts determining whether a given seizure was reasonable must "careful[ly] balanc[e] [the] governmental and private interests" at play. *Soldal*, 506 U.S. at 71 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985)).   However, this calculus is greatly simplified where, as here, government officials seize property pursuant to a court order because court-ordained seizures are presumptively lawful. *Id.* (observing that litigants challenging the reasonableness of a seizure done pursuant to a court order face "a laborious task indeed"); *see also Presley v. City of Charlottesville*, 464 F.3d 480, 486–87 (4th Cir. 2006).

This is not to say, however, that a court order authorizing a seizure amounts to a blank check.   "The Fourth Amendment requires a . . . seizure order to 'particularly describe[]' the 'things to be seized.'" *McClain v. Trendel*, No. 1:20-cv-695, 2021 WL 1227046, at *3 (M.D.N.C. Apr. 1, 2021).   This applies no less in civil matters. *Id.*   So when officers take more property than the seizure order allows—exceed the order's scope—they commit an unreasonable seizure and run afoul of the Fourth Amendment. *Id.* at ("[C]ourt orders and warrants do not authorize seizure of items that are not described or identified within the terms of the order or warrant."); *see also United States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013) ("[W]hen executing a warrant, officers are limited by its terms.").

However, that is not what happened here.   As for Plaintiffs' primary contention—that Defendants' towing was warrantless and thus unreasonable—the Court easily rejects it.   After all, Defendants had a valid order from the Circuit Court of Wood County authorizing them to tow

vehicles off the Lots.   The Circuit Court Order may not have been a warrant, but that is immaterial here, as this was a civil matter aimed at abating a nuisance, not a full-fledged criminal investigation.   *McClain*, 2021 WL 1227046, at *3.

Plaintiffs' fallback position—that Defendants exceeded the Circuit Court Order's scope—rests on a faulty reading of the Order.   Plaintiffs believe the Order allowed them to park up to five cars on Lot 816, and they also believe that the Order allowed Defendants to tow vehicles only when more than five cars were parked on it.   Keeping in line with this incorrect reading, Plaintiffs now argue that Defendants exceeded the Order by towing cars when only four were parked on the Lot.   Plaintiffs are mistaken, though, because the Order authorized Defendants to tow each vehicle.   Indeed, because Plaintiffs had created a public nuisance on Lot 816, the Order forbade them from parking any cars there until they first removed each car and then cleaned up the Lot.   Only then would Plaintiffs regain the right to park up to five cars on Lot 816.   However, if Plaintiffs failed or refused to abate the nuisance within 30 days, the Order further allowed Defendants to enter Lot 816 and remove all vehicles located there.   The record here contains no evidence showing that Plaintiffs ever removed any cars, much less every car, and abated the nuisance, so they never had the right to begin using Lot 816 for parking again.   So as far as this Court can tell, Defendants were authorized by the Order to enter Lot 816 and tow every car off the Lot.

3.   <u>Arrests</u>

Just as the Fourth Amendment prohibits unreasonable seizures of property, it also prohibits unreasonable seizures of the person.   *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018). Under the Supreme Court's Fourth Amendment jurisprudence, arrests are "the quintessential

'seizure of the person.'"   *California v. Hodari D.*, 499 U.S. 621, 624 (1991).   Warrantless arrests are unreasonable only when the arresting officer lacked "probable cause to believe that the suspect committed a crime in the officer's presence."   *Wesby*, 583 U.S. at 56.

Defining probable cause with precision is difficult.   *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("The probable-cause standard is incapable of precise definition.").   That is, probable cause is "a fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).   Probable cause instead "deals with probabilities and depends on the totality of the circumstances."   *Pringle*, 540 U.S. at 371.   It "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014).   Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."   *Wesby*, 583 U.S. at 57 (quoting *Gates*, 462 U.S. at 243–44 n.13).   Put differently, probable cause exists when "the facts available to [the arresting officer] would warrant a [person] of reasonable caution in the belief" that the suspect has committed a crime.   *Florida v. Harris*, 568 U.S. 237, 243 (2013) (internal quotation marks omitted) (second alteration in original) (quoting *Brown*, 460 U.S. at 742).   Importantly, probable cause does not require "proof beyond a reasonable doubt or by a preponderance of the evidence."   *Id.* at 243–44.   Probable cause requires only "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'"   *Id.* at 244 (alteration in original) (quoting *Gates*, 462 U.S. at 238).

Plaintiff Meeks has failed in establishing that any of his four arrests lacked probable cause. First, regarding the August 10, 2020, arrest, while City officials investigated a neighbor's complaints about junked-up cars stored on Lots 815 and 816, they learned that the 2003 Honda's VIN number indicated the car was stolen.   Defendant Martin relayed this information to

Defendant Eichhorn, who promptly investigated.   He soon arrived at Lot 816, where the Honda was parked, and began talking to Plaintiff Meeks.   After telling him about the VIN number coming back as stolen, Plaintiff Meeks handed Defendant Eichhorn what he claimed was the Honda's title, which listed Plaintiff Meeks as the Honda's owner.   Defendant Eichhorn tried to verify that the title was authentic, but the NCIC detective instead confirmed the opposite—the Honda was in fact stolen.   At this point, Defendant Eichhorn was justified in making the "entirely reasonable inference" that Plaintiff, who had just produced an apparently fraudulent title, knew he was in possession a stolen vehicle.[9]   *Pringle*, 540 U.S. at 372.   Defendant Eichhorn thus had probable cause to make the warrantless arrest, *see* W. Va. Code § 17A-8-5,[10] so the seizure was reasonable under the Fourth Amendment.

Turning now to Plaintiff Meeks' warrantless arrest at his home on February 24, 2022, the Court finds a complete dearth of evidence to support this claim.   For Plaintiff Meeks to survive summary judgment here, he needed to produce sufficient evidence for a reasonable jury to conclude that officers lacked probable cause for this arrest.   *Wesby*, 583 U.S. at 56.   But he produced *no evidence* to that effect.   At best, Plaintiff Meeks supplied the Court with video surveillance footage showing John Doe officers arriving at his home and arresting him on his porch.   That hardly runs afoul of the Fourth Amendment.   *Payton v. New York*, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the *entrance* to the house.   Absent

---

[9] Plaintiff Meeks claims that he "provided [Defendant] Eichhorn with evidence that the vehicle was not stolen and [Defendant] Eichhorn had no contrary evidence showing that it was stolen."   (ECF No. 93 at 3.)   Plaintiff, however, has not provided any record citation, affidavit, or exhibit to support this statement.   As a result, the Court is without any evidence supporting Plaintiff Meeks' position, making it impossible to find any genuine issue of material fact here.   Fed. R. Civ. P. 56(c)(1)(A) (requiring litigants trying to drum up genuine issues of material fact to "cit[e] to particular parts of materials in the record," such as "depositions, documents, electronically stored information, affidavits or declarations").

[10] West Virginia Code § 17A-8-5 "requires the State prove that a person 1) possess[ed]; 2) a vehicle; 3) that the person knew or had reason to believe it to be unlawfully taken in order to be convicted of possession of a stolen vehicle." *State v. Adamson*, No. 17-0099, 2018 WL 7134169, at *8 (W. Va. Nov. 5, 2018) (memorandum decision).

exigent circumstances, that threshold may not reasonably be crossed without a warrant." (emphasis added)).   Plaintiff Meeks has thus entirely failed to provide the Court with any meaningful context surrounding this arrest—the Court does not even know what the offense of arrest was.   Without this basic information, "[t]he only way a jury could, consistent with this evidence, find that [Plaintiff Meeks] was [arrested without probable cause] would be through speculation and guestimations.  The law forbids that." *Daniels v. Mingo Cnty. Comm'n*, No. 2:22-cv-00247, 2023 WL 7706778, at *11 (S.D. W. Va. Nov. 15, 2023).

Likewise, no reasonable jury could conclude that Plaintiff Meeks' March 5, 2022, arrest lacked probable cause.   The uncontroverted record evidence shows that Officer Stewart, also a non-party to this suit,[11] arrested Plaintiff for a slew of traffic offenses: driving on a suspended license, driving without insurance, and having an invalid inspection sticker and expired registration.   Although Plaintiff attacks the propriety of his license suspension,[12] he does not dispute that he drove on an expired registration and without insurance or a valid inspection sticker. The Court takes this silence to be a concession that probable cause existed for those traffic offenses.   Although one could reasonably question whether arresting Plaintiff Meeks for these relatively minor traffic offenses was an efficient use of City resources, the Supreme Court has been clear about the Fourth Amendment implications: an arrest for a minor, non-jailable traffic offense punishable only by fine is not unreasonable under the Fourth Amendment, so long as the arrest is

---

[11] Even if this arrest lacked probable cause, Plaintiff Meeks' claim would still fail because a non-party cannot, consistent with due process, be held liable.  *Life Techs. Copr. v. Govindaraj*, 931 F.3d 259, 264 (4th Cir. 2019) ("Under well-established principles of due process, a person is not subject to a judgment entered in litigation in which he has not been named as a party or been made a party by service of process." (internal quotation marks omitted) (*Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999))).

[12] Plaintiff seemingly disputes whether his license should have been suspended because he claims that the unpaid citations "were issued as a result of [Defendants'] ongoing wrongful conduct."   (ECF No. 93 at 4.)

supported by probable cause.   *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).   Such is the case here.

The same goes for Plaintiff Meeks' July 2022 arrest for obtaining money by false pretenses.   That arrest came about after Plaintiffs' customer, Tiffany Haugh, complained about Plaintiff Meeks to Sergeant Miller, also non-party to this suit.[13]   She complained that Plaintiff Meeks had accepted cash in exchange for repairing her car, but he failed to uphold his end of the bargain.   Plaintiff Meeks readily points out, and the Court agrees, that he could not have finished repairs on the car because Defendants seized it.   (ECF No. 93 at 4.)   But Plaintiff Meeks told Haugh none of this, nor did he return her money.   Instead, as Haugh told Sergeant Miller, Plaintiff Meeks kept her money and led her to believe he was working on the car, even telling Haugh the car was at a frame straightening shop, actively being worked on, despite it having been impounded for months.   Given these allegations, Sergeant Miller correctly concluded that probable cause existed to arrest Plaintiff for obtaining money by false pretenses.   *See* W. Va. Code § 61-3-24(a)(1).[14]

For these reasons, the Court finds that Plaintiffs' Fourth Amendment claims fail as a matter of law and Defendants must be awarded summary judgment on those claims.

B.  Fourteenth Amendment

Having dispensed with Plaintiffs' Fourth Amendment claims, the Court now turns to their Fourteenth Amendment claim.   Succinctly stated, Plaintiffs allege that Defendants violated the

---

[13] Even if this arrest lacked probable cause, Plaintiff Meeks' claim would still fail because a non-party cannot, consistent with due process, be held liable.   *See supra* note 11.

[14] To obtain a conviction under West Virginia Code § 61-3-24(a)(1), the State must prove "(1) the intent to defraud; (2) actual fraud; (3) the false pretense was used to accomplish the objective; and (4) the fraud was accomplished by means of the false pretense."   *State v. Moore*, 273 S.E.2d 821, 829 (W. Va. 1980).   "Actual fraud" occurs "when the defendant with intent to defraud another obtains from such person any money or property."   *Kennedy v. State*, 342 S.E.2d 251, 289 (W. Va. 1986).   An "intent to defraud" means "to act knowingly and with the intention or the purpose to deceive or to cheat."   *United States v. Chinasa*, 789 F. Supp. 2d 691, 697 n.5 (E.D. Va. 2011), *aff'd*, 489 F. App'x 682 (4th Cir. 2012).

Fourteenth Amendment's Due Process Clause by conducting warrantless searches and seizures. (ECF No. 93 at 14.)   However, because the Fourth Amendment—not the Due Process Clause—governs searches and seizures, their claim fails as a matter of law.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."   U.S. Const. amend. XIV, § 1.   This Clause has two distinct components.   The first, procedural due process, guarantees citizens "fair procedure[s]" before being deprived of life, liberty, or property.   *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).   The second, substantive due process, "provides heightened protection against government interference with certain fundamental rights and liberty interests."   *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (The Due Process Clause "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." (internal quotation marks omitted) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

As an initial matter, Plaintiffs cannot bring a substantive due process claim for illegal searches and seizures.   The Supreme Court has explained that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against" governmental interference, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing th[ose] claims."   *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (some internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see also United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim

must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) ("[T]he Due Process Clause is not the proper lens through which to evaluate law enforcement's pretrial missteps."). Here, the Fourth Amendment clearly "provides an explicit textual source of constitutional protection against" unlawful searches and seizures.  *Graham*, 490 U.S. at 395.  Plaintiffs therefore cannot bring a substantive due process claim for Defendants' allegedly unlawful searches and seizures.  *Lanier*, 520 U.S. at 272 n.7.

Plaintiffs, perhaps recognizing this, attempt to spin their claim as sounding in procedural due process.   In their response to Defendants' joint motion for summary judgment, Plaintiffs say their due process claim "arise[s] from the Defendant's (sic) conduct in regard to the Wood County Circuit Court Order."   (ECF No. 98 at 8.)   Specifically, Plaintiffs contend that, "[w]hile the Defendants were in possession of a" valid state court order allowing them to tow vehicles off Lot 816, "Defendants failed to stay within the four corners of that document."   (*Id.*)   Because Defendants allegedly exceeded the scope of the Circuit Court Order, Plaintiffs believe Defendants violated their right to procedural due process.   (*Id.*)

Plaintiffs cannot save their claim by placing a "procedural due process" label on it.   As explained above, procedural due process governs the fairness of procedures used to deprive citizens of life, liberty, or property.   *Collins*, 503 U.S. at 125; *see also Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" (quoting *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1863))).   Plaintiffs, however, are not attacking the *process* by which Defendants obtained the

Circuit Court Order.   Plaintiffs are instead attacking how that order was *executed*, contending that Defendants exceeded the Order's scope and seized more property than the Order allowed.   In other words, Plaintiffs claim that Defendants committed unreasonable seizures—thereby violating a substantive right secured by the Fourth Amendment.   Plaintiffs' efforts to dress up a duplicative Fourth Amendment claim in due process garb are thus unavailing, and the claim fails as a matter of law.

### C.  First Amendment

Plaintiff Meeks asserts that Defendants' searches and seizures were retaliation for exercising his First Amendment right to free speech.   Unfortunately for Plaintiff, the record before the Court contains no evidence supporting this claim.

The First Amendment, also applicable to the States by way of the Fourteenth Amendment, *Bigelow v. Virginia*, 421 U.S. 809, 811 (1975), prohibits government actors from "abridging the freedom of speech."   U.S. Const. amend. I.   The right to free speech includes the corollary right to be free from retaliation for speaking.   *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000) ("The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right.").

The Fourth Circuit uses a three-prong test when analyzing First Amendment retaliation claims.   *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015).   This test requires a plaintiff to prove that "(1) his speech was protected, (2) the 'alleged retaliatory action adversely affected' his protected speech, and (3) a causal relationship between the protected speech and the retaliation."

*Id.*  If a plaintiff fails to prove any of these three elements, his claim fails as a matter of law.  *See Huang v. Bd. of Governors of the Univ. of N.C.*, 902 F.2d 1134, 1140–41 (4th Cir. 1990).

Plaintiff Meeks easily satisfies the first *Raub* element, as he engaged in two sorts of protected speech.  First, he ran for political office, speech the First Amendment no doubt protects.  *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 302 (2022) ("The First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971))).  Second, Plaintiff Meeks filed this lawsuit, seeking to hold his elected official accountable for constitutional violations.[15]  *See Vollette v. Watson*, 978 F. Supp. 2d 572, 586 (E.D. Va. 2013).

But Plaintiff Meeks' claim falters on the second *Raub* element.  Indeed, the record is barren of any evidence showing that Defendants' conduct adversely affected his free speech.  Beginning with Plaintiff Meeks running for mayor, in support of his claim that Defendants retaliated against him for throwing his hat in the ring, Plaintiff Meeks provided the Court with only a local newspaper story, which reported on his running for mayor as a write-in candidate.  (ECF No. 93 at 3 n.3.)  Beyond that, the Court knows nothing.  Did Plaintiff Meeks drop out?  If so, why?  Did one or more of Defendants strong-arm him into bowing out against his will, thereby stifling his political speech?  Who knows?  This evidentiary insufficiency proves fatal to this

---

[15] In his motion for summary judgment, Plaintiff Meeks also presses a second, albeit new, theory of First Amendment liability: that Defendants' alleged retaliation against him for filing this suit violated his rights under the First Amendment's Petition Clause.  (ECF No. 93 at 10.)  However, his Amended Complaint makes no mention of this theory of liability, so the Court cannot and will not now address it.  *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (explaining that, at the summary judgment stage, a "plaintiff may not raise new claims" for the first time "without amending his complaint."); *see also Brass v. SPX Corp.*, No. 3:14-cv-00656, 2019 WL 7373785, at *2 (W.D.N.C. Dec. 31, 2019) ("Courts routinely refuse to consider legal theories not alleged in the complaint and raised for the first time in a brief in opposition to a motion for summary judgment.").

claim, as no reasonable jury could, on this evidentiary record, find that Defendants' conduct adversely affected Plaintiff Meeks' write-in campaign.[16]

So too with Plaintiff Meeks' lawsuit.   He needed to provide the Court with evidence that Defendants' allegedly unlawful actions in some way chilled his free speech rights, which, as it concerns this suit, requires a showing that Defendants somehow impeded his ability to litigate the case. *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993) (per curiam) ("Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.").   There is no evidence here showing that Defendants impaired Plaintiff Meeks' ability to litigate.   To the contrary, since Plaintiff initially filed this suit, Defendants' ongoing, allegedly unlawful actions have only emboldened Plaintiff Meeks to further pursue his case.   He began *pro se*, (ECF No. 1), but later retained counsel, at least one of whom proclaims to be "a seasoned litigator in the § 1983 arena."   (ECF No. 48 at 3.)   Also, as his case has progressed—and Defendants' supposedly unlawful conduct amplified—Plaintiff Meeks amended his complaint, adding new parties and new theories of liability.   (ECF No. 54.)   Those new parties and legal theories have since been pursued to discovery's end and are now fully briefed on cross-motions for summary judgment.   The Court thus fails to see how Defendants' conduct in any way adversely affected Plaintiff Meeks' lawsuit.

To be sure, in his summary judgment briefing, Plaintiff Meeks tells a tale that would likely satisfy *Raub*'s second element.   He confesses that Defendants' continual and relentless onslaught of searches, vehicle seizures, and arrests have forced him to close Byron's Garage and flee the

---

[16]  To the extent one may object that Plaintiffs' several arrests might have affected his write-in campaign, the Supreme Court has held that where, as here, an arrest was supported by probable cause, no retaliation claim can be brought based on the arrest.   *Nieves v. Bartlett*, 587 U.S. ----, 139 S. Ct. 1715, 1725 (2019).

State.   (ECF No. 98 at 4.)   There is just one rub: Plaintiff offers no evidence to bear out these claims.   The Fourth Circuit explained some three decades ago that "[t]he arguments of counsel, absent any evidence such as sworn affidavits . . ., fail to meet the evidentiary standard necessary to create a genuine issue of material fact."   *Rountree v. Fairfax Cnty. Sch. Bd.*, 933 F.2d 219, 223 (4th Cir. 1991).   That remains true today.   *Morgan v. City of Charlotte*, No. 3:22-cv-00003, 2023 WL 4002524, at *6 (W.D.N.C. June 14, 2023) ("On summary judgment the parties submit materials which create a record; and it is on that record only that the Court rules on summary judgment.   Arguments or allegations lacking admissible evidentiary support fail to create a genuine issue of material fact.").   As a result, the Court cannot consider these unsupported allegations.   Plaintiffs' First Amendment claim fails as a matter of law, too.

    D.   *Monell* Liability

Having no luck holding Defendants personally liable, Plaintiffs next try to hold the City liable for actions taken in Defendants' official capacity pursuant to City policy.[17]

In *Monell*, the Supreme Court held that § 1983 allows plaintiffs to hold a municipality liable for constitutional injuries caused by the municipality.   436 U.S. at 690.   Municipalities cause constitutional injuries by enacting policies or customs under which municipal officials act when violating someone's constitutional rights.   *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014).   Plaintiffs' *Monell* claim fails because they have not suffered any constitutional injury.   Indeed, Plaintiffs' entire theory of *Monell* liability hinges on Defendants

---

[17] Defendants believe that Plaintiffs' *Monell* claim is improper here because the City is not a party to this suit.   (ECF No. 95 at 15.)   The Court disagrees.   In *Kentucky v. Graham*, the Supreme Court said that "[o]fficial-capacity suits" are "another way of pleading an action against [the] entity of which an officer is an agent."   473 U.S. 159, 165–66 (quoting *Monell*, 436 U.S. at 690 n.55).   That is, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."   *Id.* at 166.   Plaintiffs here sued each Defendant in their official capacity as City employees, so their *Monell* claim is effectively one against the City itself.   *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 678 (4th Cir. 2023).

having violated either their First, Fourth, or Fourteenth Amendment rights, and having done so pursuant to a City policy or custom.   However, Plaintiffs failed in establishing any constitutional violation, so their *Monell* claim must be dismissed.

### E.  Civil Conspiracy to Violate Constitutional Rights

Plaintiffs' civil conspiracy claim fails for the same reason.   "To establish a conspiracy under § 1983, the plaintiff must show that the [d]efendants 'acted jointly in concert and that some overt act was done in furtherance of the conspiracy which *resulted* in [the] deprivation of a constitutional right.'"   *Barrett v. Pae Gov't Servs., Inc.*, 975 F.3d 416, 434 (4th Cir. 2020) (emphasis added) (second alteration in original) (quoting *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996)).   Plaintiffs, however, have not established any constitutional violation, so their conspiracy claim also fails.

### F.   Remaining Issues

Now that the Court has addressed all of Plaintiffs' federal claims, only two issues remain outstanding.   First, what to do with the John Does 1–10?   The Court finds dismissal of these defendants appropriate under Rule 4(m) of the Federal Rules of Civil Procedure because Plaintiffs have not, and cannot logically, serve John Does 1–10.   Thus, for the reasons set forth in Judge Goodwin's thoughtful and scholarly opinion in *Price v. Marsh*, No. 2:12-cv-05442, 2013 WL 5409811, at *3–6 (S.D. W. Va. Sept. 25, 2013), the Court **DISMISSES** John Does 1–10 **WITH PREJUDICE**.

Second, what to do with Plaintiffs' state-law claims now that their federal claims have been dismissed?   The Court thinks dismissal is appropriate here, too.   28 U.S.C. § 1367(c)(2) allows federal courts to decline exercising supplemental jurisdiction when all original jurisdiction claims

have been dismissed.   The Fourth Circuit has previously counseled against "federal court[s] . . . elbow[ing] [their] way into [state-law] controvers[ies]."   *Mitcheson v. Harris*, 955 F.2d 235, 238 (4th Cir. 1992).   This form of judicial restraint is necessary, "as a matter of comity," to avoid handing down "[n]eedless decisions of state law," which in turn "promote[s] justice between parties [and] procur[es] for them a surer-footed reading of applicable law."   *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).   To that end, the Supreme Court has said that when all "federal claims are dismissed before trial," "the state claims should be dismissed as well."   *Id.* For these reasons, the Court **DISMISSES** Plaintiffs' claims for (1) abuse of process, (2) battery, (3) and tortious interference with a business relationship **WITHOUT PREJUDICE**.

## IV.   CONCLUSION

Plaintiffs' Amended Complaint paints a bleak picture of the City of Parkersburg, West Virginia.   But the Amended Complaint is not evidence.   Therefore, because this case is at the summary judgment stage—and Plaintiffs have not produced any evidence bearing out the Amended Complaint's allegations—their claims fail as a matter of law.   Plaintiffs' joint motion for summary judgment is **DENIED**, (ECF No. 92), and Defendants' joint motion for summary judgment is **GRANTED**, (ECF No. 94).   Plaintiffs' federal claims are **DISMISSED WITH PREJUDICE**, and Plaintiffs' state-law claims are **DISMISSED WITHOUT PREJUDICE**. The Clerk is **DIRECTED** to remove this matter from the Court's active docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:      December 19, 2023

THOMAS E. JOHNSTON, CHIEF JUDGE